PEOPLE v HOLLOWAY

Docket No. 77-934. Submitted January 3, 1978, at Detroit.—Decided
  April 17, 1978.

Bruce Holloway was charged with carrying a concealed pistol and
  another concealed weapon. Defendant's motion to suppress the
  concealed weapons as evidence was denied at the preliminary
  examination and defendant was bound over for trial. At trial
  the defendant again made a motion to suppress and the trial
  judge granted the motion on the basis that private security
  guards are bound by the strictures of the Fourth Amendment
  and the defendant was ordered discharged, Recorder's Court of
  Detroit, Susan D. Borman, J. The people appeal. *Held:*

  Private security guards who are not acting under "the color
  of the law" are not bound by the strictures of the Fourth
  Amendment.

  Reversed and remanded for trial.

  N. J. KAUFMAN, J., concurred in result only:

  Security guards act under the color of law and are subject to
  the strictures of the Fourth Amendment. However, the evi-
  dence should not have been suppressed because the search
  conducted by the security guards was reasonable.

OPINION OF THE COURT

1. SEARCHES AND SEIZURES—GOVERNMENTAL OFFICERS—PRIVATE SECU-
     RITY GUARDS—RESTRAINTS—CONSTITUTIONAL LAW.
   The Fourth Amendment restraints on the activities of govern-
     mental officers does not extend to searches by private security
     guards (US Const, Am IV).

CONCURRENCE IN RESULT BY N. J. KAUFMAN, J.

2. SEARCHES AND SEIZURES—PRIVATE SECURITY GUARDS—COLOR OF
     STATE LAW—REASONABLENESS STANDARDS—POLICE OFFICERS.
   *Private security guards in reality do act under color of state law
     and, therefore, their actions in searching a person are subject*

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 68 Am Jur 2d, Searches and Seizures § 13.
Private individual: admissibility, in criminal case, of evidence ob-
  tained by search by private individual. 36 ALR3d 553.

*to the same reasonableness standards as are applicable to police officers.*

3. SEARCHES AND SEIZURES—SECURITY GUARDS—REASONABLENESS OF SEARCH—SUPPRESSION OF EVIDENCE—PAT-DOWN SEARCH.

*Evidence seized by security guards in a pat-down search of a defendant was admissible into evidence and the trial court should not have ordered the evidence suppressed where, under the circumstances surrounding the encounter between the security guards and the defendant, the search was reasonable.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Principal Attorney, Appeals, and *Maura D. Corrigan,* Assistant Prosecuting Attorney, for the people.

Before: BASHARA, P. J., and J. H. GILLIS and N. J. KAUFMAN, JJ.

BASHARA, P. J. The prosecutor appeals from an order granting defendant's motion to suppress evidence and quash the information. Defendant was charged with carrying a concealed pistol and another concealed weapon contrary to MCLA 750.227; MSA 28.424.

The facts involved are neither complicated nor disputed. A private security guard stationed at a Cunningham's drugstore in the Greyhound Bus Terminal spotted defendant acting in a "suspicious" manner, as if ready to steal some articles. The guard approached the defendant. By this time the guard's partner was already speaking to him. The guard noticed a bulge in defendant's pocket. A pat down revealed a .32-caliber pistol and a concealed knife. The weapons were turned over to the police and defendant was placed under arrest.

Defense counsel argued Fourth Amendment exclusion provisions at the preliminary examination. However, a Recorder's Court judge, sitting as ex-

amining magistrate, was not persuaded and bound defendant over for trial. The argument was renewed on motion before the trial court. The trial judge granted the motion on the basis that private security guards are bound by Fourth Amendment strictures and therefore the evidence seized by the guard must be suppressed.

The primary issue, then, is whether the Fourth Amendment restraint on the activities of governmental officers extends to searches by private security guards. We hold that it does not and, therefore, reverse the opinion of the trial court.

This Court has very clearly spoken to the issue on more than one occasion. In *People v Harry James Smith,* 31 Mich App 366, 373–374; 188 NW2d 16 (1971), the Court stated:

"As previously stated, Mr. Gunn was a private guard, not a police officer, nor was he acting under any authority of any police agency. He was, therefore, a private individual. Thus, the evidence obtained is admissible into evidence whether his actions were reasonable or unreasonable."

Again, in *People v Langley,* 63 Mich App 339, 344; 234 NW2d 513 (1975), we said, relying on *People v Smith, supra:*

"Admission of evidence obtained by a private individual, not acting under the authority of the state, is not prohibited by the U. S. Const, Am IV, whether his actions were reasonable or not."

The learned trial judge relies on decisions of the United States Supreme Court to find that arrests by private security guards are made under "color of law" and are, therefore, subject to the Fourth Amendment strictures. A review of the cited deci-

sions leads us to the conclusion that such reliance is misplaced.

In *Griffin v Maryland,* 378 US 130; 84 S Ct 1770; 12 L Ed 2d 754 (1964), the security guard involved had been deputized by the county sheriff for the express purpose of policing an amusement park where the incident complained of occurred. *Williams v United States,* 341 US 97; 71 S Ct 576; 95 L Ed 774 (1951), involved a private detective who held a special police officer's card and badge. The detective was accompanied by a city police officer sent by his superior to lend authority to the proceedings. It was under those circumstances that the United States Supreme Court determined that evidence obtained could be suppressed, because it was acquired under "the color of the law". Surely the facts in the foregoing cases are distinguishable from those at bar.

Accordingly, we would adhere to the precepts laid down in *Burdeau v McDowell,* 256 US 465, 475; 41 S Ct 574, 576; 65 L Ed 1048, 1051 (1921), which have not, so far as our research has shown, been diluted by subsequent decision. The Court stated:

"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies * * * .

"It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the Federal Government. We assume that petitioner

has an unquestionable right of redress against those who illegally and wrongfully took his private property under the circumstances herein disclosed, but with such remedies we are not now concerned."

Thus an individual has the right to redress any wrongs which may have been committed by private citizens, be they security guards or not. They can bring civil actions or file criminal complaints against the alleged offenders. It is because the cloak of sovereign immunity is wrapped around law enforcement officials that the Fourth Amendment is applied to their actions (though today a somewhat ragged cloak).

There is a growing feeling among the courts of this country that the exclusionary rule has been stretched far beyond its original and very useful purpose. That frustration was well voiced by Mr. Justice Blackmun in the recent case of *United States v Janis,* 428 US 433, 459; 96 S Ct 3021; 49 L Ed 2d 1046 (1976), *reh den,* 429 US 874; 97 S Ct 196; 50 L Ed 2d 158 (1976):

"In the past this Court has opted for exclusion in the anticipation that law enforcement officers would be deterred from violating Fourth Amendment rights. Then, as now, the Court acted in the absence of convincing empirical evidence and relied, instead, on its own assumptions of human nature and the interrelationship of the various components of the law enforcement system. In the situation before us, we do not find sufficient justification for the drastic measure of an exclusionary rule. There comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of the Executive and Legislative Branches. We find ourselves at that point in this case."

Finally we note that another panel of this Court,

in *People v Eastway,* 67 Mich 464; 241 NW2d 249
(1976), wrote to the issue here addressed. The
holding there, that the Fourth Amendment should
apply to private security guards, was only dicta to
the law of the case. Nonetheless, insofar as it
touches upon our holding, we specifically decline to
follow its result or reasoning.

Our resolution of the first issue raised makes it
unnecessary to determine whether the private
guard's actions were reasonable or justifiable.

Reversed and remanded for trial.

J. H. GILLIS, J., concurred.

N. J. KAUFMAN, J. *(concurring in result).* Histori-
cally, debate over issues of constitutional law has
largely been a matter of perspective. This case
provides a good example of that maxim. The ma-
jority ° opinion has chosen to cast the Fourth
Amendment in a narrow context and in static
terms. In so doing, it ignores the reality of a law
enforcement realm that encompasses not only sov-
ereign peace-keeping forces but other instrumen-
talities whose activities may, at times, straddle
that rather ephemeral public-private boundary
which delineates the limits of the Constitution's
scope. The majority's perspective ignores the po-
tential for tacit abuse of power on the part of the
state. It is a perspective, therefore, I cannot share.

The majority opinion is grounded in two major
premises: (1) Michigan law clearly holds that secu-
rity guards are not subject to the Fourth Amend-
ment, and (2) certain decisions of the United
States Supreme Court do not render that law
inoperative. I cannot agree with either premise.
Further, assuming *arguendo* the validity of the
majority's interpretation of its citations to support

its contentions, I nonetheless would not come to the same conclusion.

The majority opinion cites only *People v Harry James Smith,* 31 Mich App 366; 188 NW2d 16 (1971), in support of its major proposition, that security guards are not subject to the Fourth Amendment.[1] That case held that despite the fact that the security guard "was a private policeman licensed in the state of Michigan, and that he had a Detroit license to be a private patrol watchman under a Detroit ordinance",[2] he was nonetheless a private person in terms of the Fourth Amendment. However, this Court further explained:

"To hold a private individual to the same standard of conduct as that required of a police officer who acts with, for, and on behalf of the authority of the state, would create a chaotic situation. We recognize that Mr. Gunn was a private policeman but unless, and until, the Legislature or the Supreme Court of the State of Michigan or the Supreme Court of the United States places upon private policemen the same standard of care as is placed on police officers they are acting in an individual and private capacity." 31 Mich App at 375.

I believe that the Legislature has placed "upon private policemen the same standard of care as is placed on police officers". MCLA 338.1080; MSA 18.185(30) states:

"Sec. 30. Any private security police officer, as defined in section 29, who is properly licensed under this act shall have the authority to arrest a person without a warrant as set forth for public peace officers in section 15 of chapter 4 of Act No. 175 of the Public Acts of 1927, being section 764.15 of the Compiled Laws of 1948

---

[1] The citation to *People v Langley,* 63 Mich App 339; 234 NW2d 513 (1975), is factually distinguishable as the private individual involved was the brother of the victim. Its inclusion merely begs the question.

[2] 31 Mich App at 369.

when such security police officer is on his employer's premises. Such authority shall be limited to his hours of employment as a private police officer and shall not extend beyond the boundaries of the property of his employer, and while such officer is in the full uniform of his employer." (Footnote omitted.)

Thus, at least some security guards have the same powers as police officers. Ostensibly, the provision is limited by MCLA 338.1079; MSA 18.185(29):

"Sec. 29. This act shall not require licensing of any private security police employed for the purpose of guarding the property and employees of their employer and generally maintaining plant security for their employer, provided however, that any person, firm or corporation maintaining a private security police organization may voluntarily apply for licensing under this act. When a private security police employer described and defined in this section provides the employee with a pistol for the purpose of protecting the property of the employer, such pistol shall be considered the property of the employer and the employer shall retain custody thereof except during the actual working hours of the employee. All such private security people shall be subject to the provisions of section 19, subsection (1) of this act."

Certainly the argument can be made that MCLA 338.1080; MSA 18.185(30) refers to, and is applicable to, only proprietary security guards who work in-house for a parent company who has voluntarily become licensed and supplies the training requirements of MCLA 338.1079; MSA 18.185(29).

However, such a construction would ignore the legislative intent of the Private Security Guard Act of 1968:

"[T]o license and regulate private security guards,

private police, special police, security technicians, watchmen, patrol service, * * * to provide penalties for violations; * * * establish minimum qualifications for individuals as well as private agencies engaged in private security work."

It would also ignore the rather pervasive licensing requirements embodied in MCLA 338.1053; MSA 18.185(3),[3] and MCLA 338.1056; MSA 18.185(6).[4]

---

[3] "Sec. 3. (1) A person, firm, company, partnership, or corporation shall not engage in the business of alarm system contractor, alarm system agent, private security guard, private police, special police, patrol service, or an agency furnishing those services, notwithstanding the name or title used in describing the agency and notwithstanding that other functions and services may also be performed for fee, hire, or reward. Nor shall a person, firm, company, partnership, or corporation advertise the business to be that of alarm system contractor, alarm system agent, private security guard agency, or an agency furnishing those services without having first obtained from the department a license to do so, as hereinafter provided, for each bureau, agency, subagency, office, and branch office to be owned, conducted, managed, or maintained for the conduct of that business. Violation of this section is a misdemeanor punishable by imprisonment for not more than 90 days, or by a fine of not more than $1,000.00, or both."

[4] "Sec. 6. (1) The department shall issue a license to conduct business as an alarm system contractor or a private security guard or agency, if it is satisfied that the applicant is a person, or if a firm, partnership, company, or corporation, the sole or principal license holder is a person who meets all of the following qualifications:

"(a) Is a citizen of the United States.

"(b) Is not less than 25 years of age.

"(c) Has a high school education or its equivalent.

"(d) Is currently, and has been for not less than 1 year, a resident of this state.

"(e) Has not been under any sentence for the commission of a felony within 5 years prior to application, including parole, probation, or actual incarceration.

"(f) Has not been dishonorably discharged from a branch of the United States military service.

"(g) In the case of an applicant for a private security guard or agency license, has been lawfully engaged in 1 of the following:

"(i) In the private security guard or agency business on his own account for a period of not less than 3 years.

"(ii) In the private security guard or agency business for a period of not less than 3 years as an employee of the holder of a certificate of authority to conduct a private security guard or agency business, and has had experience reasonably equivalent to not less than 4 years of

A more expansive reading of MCLA 338.1080; MSA 18.185(30) would satisfy the *Smith* condition and would bring security guards within the ambit of the Fourth Amendment.

Significantly, this viewpoint has already been expressed by this Court in *People v Eastway,* 67 Mich App 464; 241 NW2d 249 (1976),[5] specifically disapproved of by the majority. Thus, I would dispute their contention that Michigan law is clear on this subject.

As Michigan law is not clear, it remains for this panel to decide in which direction to turn at the crossroads. Do private security guards act in such a manner so that their activities may be classified as "public" or "governmental"? If the answer is "yes", then the Fourth Amendment is applicable.

---

full-time guard work in a supervisory capacity with rank above that of patrolman.

"(iii) In law enforcement employment on a full-time basis for not less than 4 years for a city, county, or state government, or for the United States government.

"(iv) In the private security guard or agency business as an employee or on his own account, or as a security administrator in private business for not less than 2 years on a full-time basis, and is a graduate or its equivalent in the field of police administration or industrial security from an accredited college or university.

\* \* \*

"(j) Has posted with the department a bond provided for in this act.

"(k) Has not been adjudged insane, unless restored to sanity by court order.

"(2) In the case of a person, firm, partnership, company, or corporation now doing or seeking to do business in this state, the resident manager shall comply with the applicable qualifications of this section."

[5] It is noteworthy that the *Eastway* holding is characterized as dictum. It is true that this Court states, "We need not reach that question, however, as the search and seizure complained of in this case was not unreasonable." 67 Mich App at 467. However, had this Court strictly followed *Smith,* that analysis would be superfluous as the reasonableness of a private person's actions need not be assessed. This Court clearly analyzed the private security guard's actions as it would any other peace officer. It did not apply the exclusionary rule to the evidence seized, because the search was not unreasonable.

As noted in *Berger v New York,* 388 US 41, 53; 87
S Ct 1873; 18 L Ed 2d 1040 (1967):

  " 'The basic purpose of this Amendment, as recog-
nized in countless decisions of this Court, is to safe-
guard the privacy and security of individuals against
arbitrary invasions by governmental officials.' " *[Cam-
ara v Municipal Court of the City and County of San
Francisco,* 387 US 523, 528; 87 S Ct 1727; 18 L Ed 2d
930 (1967)]."

It is too simplistic to divide the world into public
and private sectors and presume security guards to
be on the private side. Security guards are hired to
provide security for persons and property, *cf. Peo-
ple v Smith,* 82 Misc 2d 204; 368 NYS2d 954
(1975), precisely the function given to other gov-
ernmentally constituted peace-keeping forces. A
more detailed and practical examination should be
undertaken.

Underlying the Fourth Amendment's prohibi-
tions against unwarranted governmental searches
is the fact that people have a right of privacy
which ought not be abridged by such activities. In
*Boyd v United States,* 116 US 616; 6 S Ct 524; 29 L
Ed 746 (1886), the United States Supreme Court
discussed the intent of the framers and then de-
clared:

  "The principles laid down in this opinion affect the
*very essence of constitutional liberty and security.* They
reach farther than the concrete form of the case * * *
they apply to all invasions on the part of the govern-
ment and its employes of the sanctity of a man's home
and the privacies of life." 116 US at 630. (Emphasis
added.)

Private security guards, as noted earlier, fall
into a "gray" area astride the public-private dis-

tinction. To err on the side of a restrictive interpretation of the Fourth Amendment would be to sanction the possibility of widespread abuse of the privacy rights of individuals by private security guards. We live in an era where citizens' fears for personal security lead to the formation of private law-enforcement groups. We may acknowledge the fact that public law-enforcement agencies try to discourage such groups; but must we stand ostrich-like to the destruction of basic constitutional rights merely because the police did not encourage the lawless behavior which attends this process? Respect for the law is not furthered by telling the citizenry at large that they may conduct illegal searches and turn the evidence over to the police to circumvent the Constitution. Illegal searches would still be undertaken even if officially "discouraged". The Court in *People v Williams,* 53 Misc 2d 1086, 1091; 281 NYS2d 251, 256 (1967), expressed it best:

"It seems ludicrous to say that a District Attorney in prosecuting a defendant cannot use evidence obtained by a policeman in derogation of a defendant's constitutional rights, but can use this same evidence obtained by a private person in derogation of a defendant's constitutional rights, which in turn is handed over to a policeman who then hands it over to a District Attorney."

This is not to suggest that publication of the majority opinion will lead to widespread illegal searches by private individuals. Clearly, most people have neither the opportunity nor the means to do so. But there is one group who has both—private security guards.

Ill-trained in the subtleties of the law of search and seizure, private security guards are more

likely than public law-enforcement officials to conduct illegal searches and seizures. In addition, private security guards have accoutrements of office that tend to radiate an air of authority not possessed by other private individuals. Of particular importance are the uniform and the badge, both regulated by the state.[6]

Therefore, it seems truly myopic to suggest that although the tasks of private security guards and police officers are similar,[7] although *at least* some security guards have the same arrest powers as do police officers, and although security guards' practical authority derives from trappings akin to those of public law-enforcement officials, private security guards are nonetheless to be treated as any other private individual in terms of the Fourth Amendment.[8]

In reality, private security guards do act under "color of state law". It may be admitted that this case is not so compelling as *Griffin v Maryland,* 378 US 130; 84 S Ct 1770; 12 L Ed 2d 754 (1964), or *Williams v United States,* 341 US 97; 71 S Ct 576; 95 L Ed 774 (1951). However, despite the majority's summary treatment of those cases, I cannot—as does the majority—fault the trial court for failing to see that one state intermediate appellate opinion renders the conclusion of the United States Supreme Court in the two cases cited *supra* inapposite here.

---

[6] *See* MCLA 338.1069; MSA 18.185(19).

[7] Private security guards, of course, being limited to the scope of their employment.

[8] Surely it will be argued that the mere fact of licensing alone does not a public official make. It is true that recitation of a familiar "talismanic formula", *People v Beard,* 78 Mich App 636, 639; 261 NW2d 27 (1977), has a soothing effect on those who invoke it. But even fervent incantation cannot dispel the reality of what function is being licensed here—that of protection of person and property by an organized peace-keeping force.

Having thus concluded that the conduct of private guards is subject to the limitations of the Fourth Amendment it is still necessary to determine if the search and seizure of the weapon in this case was reasonable under *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). I would hold that it was.

The inquiry demanded by *Terry* is a dual one:

"whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 US at 20.

*Terry* itself provides guidelines to determine whether the security guard's action in the instant case was justified at its inception. The *Terry* majority opinion recognized a variety of "street encounters" between police officers and citizens ranging from friendly exchanges of pleasantries to hostile confrontations of armed men involving arrest, or injuries, or loss of life. *Terry, supra,* 392 US at 13. The majority opinion in *Terry* referred to the need to balance the interests involved—the neutralization of danger to the policeman in the investigative circumstances and the sanctity of the individual. *Terry, supra,* 392 US at 26. Thus,

"[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. * * * And in determining whether the officer acted reasonably in

such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Citations omitted.) 392 US at 27.

In this case, defendant's suspicious behavior, combined with the fact the guard noticed a bulge in defendant's pocket, justified a limited pat-down condoned by *Terry* and conducted here.[9]

Therefore, although I disagree with the reasoning of the majority opinion, I join in the result.

---

[9] In so concluding, I acknowledge this Court's holding in *People v Terrell*, 77 Mich App 676; 259 NW2d 187 (1977). I have no quarrel with the disposition of that case and agree with its reasoning. However, there are two salient features which distinguish *Terrell* from this case. *Terrell* took place out-of-doors and no "bulge" was readily apparent. That differs from the factual situation here where the chances of innocent people being injured were greater because the incident took place in the drugstore of the bus station. It was prudent for the security guard to make a *Terry* stop here even if it would not have been proper on the street.